**20CV7381** **RECEIVED** ID

12/11/2020

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATES OF ILLINOIS, INDIANA, MICHIGAN, NEW YORK, NORTH CAROLINA, RHODE ISLAND, TENNESSEE, and TEXAS *ex rel.* JOSEPH STINSON,<br><br>    **Plaintiffs/Relator,**<br>    -v-<br><br>OAK STREET HEALTH, INC., OAK STREET HEALTH, LLC, and JOHN DOE ENTITIES 1-10,<br><br>    **Defendants.** | Case No._____<br><br>**COMPLAINT AND JURY DEMAND**<br><br>**TO BE FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br><br>JUDGE PALLMEYER<br>MAGISTRATE JUDGE VALDEZ |

Plaintiff-Relator Joseph Stinson ("Relator" or "Mr. Stinson"), by and through the undersigned counsel, and on behalf of the United States of America ("United States") and the States of Illinois, Indiana, Michigan, New York, North Carolina, Rhode Island, Tennessee and Texas (the "States") (collectively, the "Government"), hereby alleges as follows:

## I.    INTRODUCTION

1.    This is a *qui tam* action, brought by Mr. Stinson on his own behalf and on behalf of the Government, against Oak Street Health, Inc., Oak Street Health LLC (together, "Oak Street"), and John Doe Entities 1–10 ("John Doe Entities") (collectively, "Defendants") for using, making, presenting, and causing to make, use, or present false claims to the Government in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.* and applicable state law equivalents (together, the "False Claims Act").

2.    Mr. Stinson is President/CEO of Stinson Group LLC ("Stinson Group"), a field marketing organization ("FMO") that offers insurance products and services to insurance agents

and agencies. Stinson Group partners with elite agents and quality carriers to bring premier healthcare products to those in need. In the most basic sense, Stinson Group contracts with health insurance carriers to market and sell a variety of insurance products, including Medicare Advantage ("MA") plans, to individual clients, through a network of independent marketing/sales agents.

3.      Oak Street is a large, rapidly growing healthcare company operating primary care centers, whose business model focuses exclusively on targeting and serving Medicare and dual eligible Medicare/Medicaid beneficiaries.[1] Founded in 2012, Oak Street now has 79 centers located across the country, including in Illinois, Indiana, Michigan, Mississippi, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, Tennessee, and Texas—and is in the process of opening new centers in additional states. In August 2020, Oak Street went public (NYSE: OSH) for $328 million.[2]

4.      The fraud alleged herein is straightforward. Oak Street has implemented various illegal kickback and inducement schemes in order to solicit referrals and increase enrollments of Medicare/Medicaid beneficiaries at Oak Street—resulting in the Government paying for healthcare services that are tainted by these illegal kickbacks and inducements. In particular, and as more fully outlined herein (*see infra* Section VI), since at least August 2020 and, upon information and belief, since as early as 2012, Oak Street has defrauded the Government by:

(a)      engaging in illegal kickback arrangements with third party

---

[1] About Us, Oak Street Health, *available at* https://www.oakstreethealth.com/mission (last visited Nov. 23, 2020). About 40% of Oak Street's patients are dual eligible for both Medicare and Medicaid. *See* Common Questions, Oak Street Health, *available at* https://www.oakstreethealth.com/practice-at-oak-street-health (last visited Nov. 24, 2020).
[2] Miller, Ben, *Medicare Center Oak Street Health Goes Public, Raises about $328 Million*, CHICAGO BUSINESS JOURNAL (Aug. 6, 2020), *available at* https://www.bizjournals.com/chicago/news/2020/08/06/medicare-center-oak-street-health-goes-public.html (last visited Nov. 23, 2020).

marketing/sales agents and entities (*i.e.*, the John Doe Entities)—providing them cash, free marketing materials, and commission payments in exchange for referring their Medicare/Medicaid beneficiaries to enroll at Oak Street; and

(b) improperly advertising, offering, and providing free transportation to Medicare/Medicaid beneficiaries to illegally induce them to enroll at Oak Street.

5. Federal law explicitly prohibits healthcare providers (such as Oak Street) from paying kickbacks in exchange for patient referrals, as well as from offering and providing free services (such as free transportation) to induce Medicare/Medicaid beneficiaries to receive healthcare services payable by a federal healthcare program. *E.g.,* 42 U.S.C. § 1320a-7b (Anti-Kickback Statute ("AKS"): prohibiting offering or providing remuneration for the purpose of inducing any person to refer services payable government healthcare program); 42 U.S.C. § 1320a-7a (Anti-Inducement Statute: prohibiting offering or providing remuneration for the purpose of influencing recipients to receive care from a particular provider); OIG Advisory Opinion No. 07-02; *see* HHS OIG Advisory Opinion No. 00-7 ("Healthcare providers that offer free goods or services, such as free transportation, to federal healthcare beneficiaries may be subject to civil monetary penalties [under the Anti-Inducement Act]. . . . Moreover, free transportation services may implicate the criminal [A]nti-[K]ickback [S]tatute . . . .").

6. Oak Street is well-aware of these explicit prohibitions; indeed, Oak Street's own Code of Conduct expressly warns against offering such kickbacks and inducements, stating:

A kickback is an improper payment, gift, service, or item of value offered or received in return for increased business, including, but not limited to, patient referrals. Under the AKS, kickbacks are prohibited, and directly or indirectly giving or offering anything of value in exchange for patient referrals is a violation of the law.

In order to comply with the AKS, You cannot accept, solicit, or provide kickbacks in return for patient referral[s] . . . .

\* \* \* \*

> You are prohibited from receiving, or giving, any gifts that compromise, or appear to compromise, your ability to make objective and fair business decisions. In addition, You are prohibited from offering, giving, providing, or accepting, a gift unless: the value is $15 or less and is not being offered to induce or motivate a patient to seek care from Oak Street. [3]

7.      Despite these clear prohibitions, Oak Street nevertheless knowingly and purposefully implemented the fraudulent practices alleged herein, designed to target, induce, and exploit vulnerable Medicare/Medicaid beneficiaries (many of whom are elderly, disabled, and low-income)—all to illegally increase patient enrollments at Oak Street at the expense of the Government.

8.      Mr. Stinson discovered the fraud after Stinson Group was contacted by Oak Street with a request to use Stinson Group's network of agents to refer Medicare/Medicaid beneficiaries to Oak Street. Mr. Stinson participated in multiple phone calls with Oak Street, during which Oak Street solicited Stinson Group to participate in the fraudulent scheme. Mr. Stinson immediately recognized the conduct as fraudulent and illegal, declined to conduct business with Oak Street, and took immediate action to report the fraud to the Government.

9.      The damages incurred by the Government as a result of Oak Street's fraudulent scheme are substantial. Because Oak Street improperly procured and enrolled Medicare/Medicaid beneficiaries as patients using the illegal kickback and inducement schemes described herein, all services and care provided to those patients are tainted and not lawfully payable by the Government. Therefore, a significant portion of Oak Street's Medicare/Medicaid revenue from

---

[3] Code of Conduct, Oak Street Health, Inc., *available at* https://s25.q4cdn.com/801682165/files/doc_downloads/governance/Oak-Street-Health-Inc-Code-of-Conduct-(final).pdf (last visited Nov. 23, 2020).

2012 to the present is tainted as a result of the illegal kickback and inducements schemes. For reference, Oak Street's Q3 2020 revenue from Medicare/Medicaid was $218 million (a 57% increase from its Q3 2019 revenue), and the company projects full-year 2020 Medicare/Medicaid revenue between $854 million to $858 million.[4] Much of this revenue, from 2012 to the present, is at issue in this FCA case. Upon information and belief, the fraud continues still today—and will no doubt continue to grow in scope as Oak Street opens additional clinics in other states.

10. Under the terms of the False Claims Act, this *qui tam* Complaint is to be filed *in camera* and under seal and is to remain under seal for a period of at least sixty (60) days and shall not be served on Defendants until the Court so orders. The Government may elect to intervene and proceed with the action within the 60-day time frame, or within any extensions of that initial sixty-day period granted by the Court for good cause shown, after it receives both the Complaint and the material evidence submitted to it.

## II.   NATURE OF THE ACTION

11. This is an action to recover treble damages and civil penalties arising from the fraudulent conduct of Defendants for using, making, presenting, and causing to make, use, or present false statements and claims to the Government in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.* and applicable state law.

12. Under the False Claims Act, a private person may bring an action in federal district

---

[4] Landi, Healther, *Oak Street Health Opens 13 Health Centers in Q3 as Revenue Jumps 57%*, FIERCE HEALTHCARE (Nov. 10, 2020), *available at* https://www.fiercehealthcare.com/practices/oak-street-health-opens-13-health-centers-q3-as-revenue-grew-57-to-218m (last visited Nov. 24, 2020); *Leading the $2.8 Trillion US Healthcare Market: CEO's of Oak Street Health, Skylight Health, 1life Healthcare and Teladoc – Driving Explosive Revenue Growth with Innovation and New Market Expansions*, GLOBENEWSWIRE (Dec. 3, 2020), *available at* https://www.globenewswire.com/news-release/2020/12/03/2139352/0/en/Leading-the-2-8-Trillion-US-Healthcare-Market-CEO-s-of-Oak-Street-Health-Skylight-Health-1life-Healthcare-and-Teladoc-Driving-Explosive-Revenue-Growth-with-Innovation-and-New-Marke.html (last visited Dec. 4, 2020).

court for itself and for the United States, and may share in any recovery. 31 U.S.C. § 3730(b). That private person is known as a "Relator" and the action that the Relator brings is called a *qui tam* action. The relevant state law FCA equivalents are to similar effect.

## III. JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction to adjudicate this action under 28 U.S.C. §§ 1331, 1345.

14. This Court has personal jurisdiction over Oak Street pursuant to 31 U.S.C. § 3732(a) because Oak Street transact has its principal place of business in the State of Illinois.

15. Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Oak Street can be found in this District and because some of the acts and transactions upon which the claims asserted here are based took place in the Northern District of Illinois.

## IV. THE PARTIES

16. Mr. Stinson brings this action on behalf of the United States, including its agency, the Department of Health and Human Services, whose component, the Centers for Medicare & Medicaid Services ("CMS," formerly the Health Care Financing Administration), oversees certain government healthcare programs, including Medicaid, Medicare Part B, and Medicare Part C (Medicare Advantage), (collectively, "Medicare").

17. Mr. Stinson also brings this action on behalf of the States of Illinois, Indiana, Michigan, New York, North Carolina, Rhode Island, Tennessee and Texas, including all state counterpart agencies to the federal agencies referenced above (collectively, "Medicaid").

18. Mr. Stinson also brings this action on his own behalf, as permitted under the False Claims Act. Mr. Stinson is a Michigan resident who discovered Oak Street's fraudulent scheme

when Oak Street contacted his company, Stinson Group, for marketing services aimed at bringing Medicare/Medicaid beneficiaries to Oak Street. Mr. Stinson has direct and independent knowledge of the information on which the allegations set forth in this Complaint are based, is the original source of these allegations, and has knowledge of the false claims and records that Oak Street knowingly, falsely, and fraudulently submitted to the Government as alleged herein.

19.     Oak Street Health, Inc. is a Delaware corporation with its principal place of business located at 30 W. Monroe Street, Suite 1200, Chicago, Illinois 60603. Oak Street Health, Inc. was formed on October 22, 2019, for the purpose of completing a public offering and related restructuring transactions in order to carry on the business of Oak Street Health, LLC ("OSH LLC") and its affiliates. As the managing member of OSH LLC, Oak Street Health, Inc. operates and controls all of the business affairs of OSH LLC and its affiliates.[5]

20.     Oak Street Health, LLC is an Illinois limited liability company with its principal place of business located at 1101 West Fulton, Suite 200, Chicago, Illinois 60607.

21.     Upon information and belief, John Doe Entities 1–10 are various legal entities, the names and address of which are unknown at this time.

## V.    <u>LEGAL FRAMEWORK</u>

### A.    <u>The False Claims Act</u>

22.     The False Claims Act imposes civil liability upon any person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

---

[5] Form 10-QP, Oak Street Health, Inc., UNITED STATES SECURITIES AND EXCHANGE COMMISSION (Sept. 30, 2020), *available at* https://www.sec.gov/Archives/edgar/data/1564406/000156459020 052608/osh-10q_20200930.htm (last visited Nov. 23, 2020).

. . . .

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a). The Affordable Care Act requires a person who has received an overpayment from the Government to report and return the overpayment within 60 days of identification, or the date that any corresponding cost report is due; and failure to report and return the overpayment is an obligation for purposes of the False Claims Act under 31 U.S.C. § 3729(a)(1)(G). *See* 42 U.S.C. § 1320a-7k(d).

23.     For purposes of the FCA:

(1) the terms "knowing" and "knowingly"

(A) mean that a person, with respect to information – (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b).

24.     Effective November 2, 2015 (the date of enactment of the Federal Civil Penalties Inflation Adjustment Act, Improvements Act of 2015, Public Law 114-74, sec. 701 ("2015 Amendments")), the penalties increased from a minimum-maximum per-claim penalty of $5,500 and $11,000 to $10,781 and $21,563. The increased amounts apply to civil penalties assessed for violations occurring after November 2, 2015. Violations that occurred on or before November 2, 2015 are subject to the previous penalty amounts. On February 3, 2016, pursuant to the 2015 Amendments annual re-indexing of the FCA penalties for inflation, the civil penalties again increased to a minimum-maximum per-claim penalty of $10,957 and $21,916. On January 19,

2018, the FCA penalties were again increased to a minimum-maximum per-claim penalty of $11,181 and $22,363. In February 2019, the amounts were increased again to $11,463 and $22,927. 84 Fed. Reg. 2445, 2446 (Feb. 7, 2019). In January 2020, these amounts were again increased to $11,665 and $23,331. 15 C.F.R. § 6.3 (2020); 85 Fed. Reg. 207, 208 (Jan. 3, 2020).

**B.** **The Medicare Program**

25. The Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program, was created in 1965 as part of the Social Security Act to pay the costs of certain healthcare services for eligible individuals. The Secretary of Health and Human Services ("HHS"), an agency of the United States whose activities, operations, and contracts are paid from federal funds, administers the Medicare program through the Centers for Medicare and Medicaid Services ("CMS"), a component of HHS.

26. Medicare is a 100% federally subsidized health insurance system for eligible Americans, including those aged 65 and older, certain disabled people, and certain people with chronic diseases who elect coverage. 42 U.S.C. § 1395c; *see* 42 U.S.C. §§ 1395j-1395w. To participate in Medicare, a provider must sign and file a Provider Agreement with CMS promising compliance with applicable statutes, regulations, and guidance. 42 U.S.C. § 1395cc; 42 C.F.R. § 412.23(e)(1). Medicare service providers have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those delineated in the Medicare Manuals. *Heckler v. Cmty. Health Serv. of Crawford Co., Inc.,* 467 U.S. 51, 64–65 (1984).

27. By participating in the Medicare program, Oak Street is charged with actual notice and knowledge of the federal and state statutes, regulations, and rules applicable to the Medicare program, and has consented to compliance with all such statutes, regulations, and rules, including those governing reimbursement.

C. **The Medicaid Program**

28.     Medicaid is a joint federal-state program that pays for healthcare services for low-income individuals, including pregnant women, children, and parents and other caretaker relatives, as well as elderly and disabled individuals.  As a result of the Affordable Care Act, each state had the option to expand eligibility for Medicaid beginning in calendar year 2014 to all nonelderly adults with income below 138 percent of the federal poverty guidelines.

29.     Medicaid is jointly funded by state and federal governments.  The federal government's share of each state's Medicaid spending, known as the Federal Medical Assistance Percentage ("FMAP"), is based upon the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b).  Such share must be at least 50 percent, but no more than 83 percent, and historically has averaged about 57 percent.  In other words, the federal government guarantees to match at least $1 in federal funds for every $1 any individual state spends on its Medicaid program.

30.     State Medicaid programs must comply with the minimum requirements set forth in the federal Medicaid statute to qualify for federal funding. 42 U.S.C. § 1396a.  In order to receive reimbursement from Medicaid, a provider must submit a signed claims form to the state's Medicaid program, certifying that the information on the form is "true, accurate, and complete." 42 C.F.R. § 455.18.  The provider further certifies that it "understand[s] that payment of this claim will be from federal and state funds, and that any falsification, or concealment of a material fact, may be prosecuted under federal and state laws."  *Id*.

31.     By participating in a state's Medicaid program, Defendants are charged with actual notice and knowledge of the federal and state statutes, regulations, and rules applicable to the Medicaid program, and has consented to compliance with all such statutes, regulations, and rules,

including those governing reimbursement.

### D. The Anti-Kickback Statute

32.    The Medicare and Medicaid Patient Protection Act a/k/a the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("AKS"), was enacted to address Congress's concerns that remuneration to those in positions to influence healthcare decisions will cause corruption in the industry and may result in providers rendering goods and services excessively expensive and/or medically unnecessary.

33.    The AKS prohibits, among other things, knowingly offering or providing remuneration for the purpose of inducing any person for referring, recommending, or arranging for the purchase of any good or service for which payment may be made, in whole or in part, under a government healthcare program.  42 U.S.C. § 1320a-7b(b) & (f).

34.    In particular, the AKS provides that:

> (2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to induce such person—
>
> . . . .
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal healthcare program,
>
> shall be guilty of a felony upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

*Id*.  The AKS is violated if one purpose of the arrangement is to induce unlawful referrals, regardless if other legitimate purposes also exist.

35.    The AKS prohibits not only outright bribes, but *any and all forms of remuneration*

by a healthcare provider to another the purpose of inducing patient referrals. While the remuneration may have other lawful purposes, so long as one of the purposes is to induce or influence, then AKS is violated.

36.     Pursuant to the ACA, a violation of the AKS constitutes a false or fraudulent claim for purposes of the False Claims Act. Pub. L. 111-148, § 6402(f)(1), 124 Stat. 119 (2010), codified at 42 U.S.C. § 1320-7b(g) (noting that a claim "that includes items or services resulting from a violation of the [Anti-Kickback Statute] constitutes a false or fraudulent claim" for purposes of the False Claims Act). Indeed, compliance with AKS is a precondition to participation in federally-funded healthcare programs and state Medicaid programs. Payments for reimbursement under both Medicare and Medicaid are conditioned on compliance with, among other things, the AKS.

### E.     The Anti-Inducement Statute

37.     Similar to the AKS, the Anti-Inducement Statute (§ 1128A(a)(5) of the Social Security Act) ("AIS") explicitly prohibits, among other things, offering or providing remuneration for the purpose of influencing recipients to order or receive care from a particular provider, the payment of which may be made under Medicare. 42 U.S.C. § 1320a-7a(a)(5). Also referred to as the "beneficiary inducement prohibition," this provision states:

> It is unlawful for any organization, or entity to "offer . . . or transfer remuneration to any individual eligible for [Medicare] benefits . . . that such [organization] knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made."

*Id.* (emphasis added). Violations may result in penalties of $10,000 per item or service provided, treble damages, repayment of amounts paid, and exclusion from federal programs. *Id.*

38.     The term "remuneration" is generally interpreted very broadly to encompass anything of value including, without limitation, transfers of items or services for free or for other

than fair market value. *E.g.,* 42 U.S.C. §1320a-7a(i)(6).

39.     An unlawful inducement may be either direct or indirect. In a 2002 Special

Advisory Bulletin, the Office of Inspector General stated:

> [E]ven if a provider does not directly advertise or promote the availability of a benefit to beneficiaries, there may be indirect marketing or promotional efforts to informal channels of information dissemination, such as "word of mouth" promotion by practitioners or patient support groups.

Office of Inspector General, *Special Advisory Bulletin: Offering Gifts and Other Inducements to Beneficiaries* (August 2002) (emphasis added). In addition, the OIG stated that "the provision of free goods or services to existing customers who have an ongoing relationship with a provider is likely to influence those customers' future purchases." *Id.* (emphasis added).

40.     Compliance with the AIS is a precondition to participation in federally-funded healthcare programs and state Medicaid programs, and payments for reimbursement under both Medicare and Medicaid are conditioned upon compliance with, among other things, the AIS.

**F.      The Prohibition on Offering and Providing Free Transportation Services**

41.     Under both the AKS and AIS, federal law prohibits healthcare providers from offering and providing free goods or services to induce Medicare beneficiaries to purchase, order, or receive goods or services payable by a federal healthcare program. 42 U.S.C. § 1320a-7b; 42 U.S.C. § 1320a-7a. Examples of unlawful inducements include, but are not limited to, offering and providing free transportation services.

42.     The Office of Inspector General has determined that free/discounted transportation services implicate the AKS and AIS because they are likely to influence and induce a Medicare beneficiary's initial or subsequent choice to obtain services, as well as influence the beneficiary to choose one provider over another. OIG Advisory Opinion No. 07-02; *see* HHS OIG Advisory Opinion No. 00-7 ("Healthcare providers that offer free goods or services, such as free

transportation, to federal healthcare beneficiaries may be subject to civil monetary penalties [under the Anti-Inducement Act]. . . . Moreover, free transportation services may implicate the criminal [A]nti-[K]ickback [S]tatute . . . .").  While federal law allows healthcare providers to provide free/discounted local transportation to new patients, the "transportation cannot be used as a recruiting tool."  81 Fed. Reg. 88368, 88382 (Dec. 7, 2016).

43.    The free transportation services need not be directly advertised or marketed to be unlawful; indirect "word of mouth" dissemination is sufficient.  Office of Inspector General, *Special Advisory Bulletin: Offering Gifts and Other Inducements to Beneficiaries* (August 2002); HHS OIG Advisory Opinion No. 07-02 ("The fact that the subsidized [transportation] services are not advertised directly to patients is not a meaningful safeguard; the availability of the reduced cost [transportation] services will be known to patients' physicians, who may serve as indirect channels of information dissemination.").

44.    While a safe harbor exception exists under the AKS for certain free/discounted transportation services, certain conditions must be met for it to apply—namely, the transportation cannot be publicly marketed or advertised by the healthcare provider.  42 C.F.R. § 1001.952(bb).

## VI.    FACTUAL ALLEGATIONS

45.    Oak Street has implemented illegal kickback and inducement schemes in order to solicit referrals and increase enrollments of Medicare/Medicaid beneficiaries at Oak Street—resulting in Government paying for healthcare services that are tainted by these illegal kickbacks and inducements.

46.    In particular, and as more fully outlined below, since at least August 2020 and, upon information and belief, since as early as 2012, Oak Street has defrauded the Government by:

        (a)    engaging in illegal kickback arrangements with third party marketing/sales agents and entities (*i.e.*, the John Doe

Entities)—providing them cash, free marketing materials, and commission payments in exchange for referring their Medicare/Medicaid beneficiaries to enroll at Oak Street; and

(b)　　improperly advertising, offering, and providing free transportation to Medicare/Medicaid beneficiaries to illegally induce them to enroll at Oak Street.

47.　　Oak Street knowingly and purposefully implemented these fraudulent practices so as to target, induce, and exploit vulnerable elderly Medicare beneficiaries (many of whom are disabled and low-income) to become its patients—all to illegally increase enrollments at Oak Street at the expense of the Government.

**A.**　　**Illegally Paying Kickbacks to John Doe Entities to Solicit and Refer Medicare/Medicaid Beneficiaries to Oak Street**

48.　　Since at least August 2020 (and upon information and belief, since as early as 2012), Oak Street has been engaging in illegal kickback arrangements with third party marketing/sales agents and entities (*i.e.*, the John Doe Entities)—providing them cash, free marketing materials, and commission payments in exchange for referring their Medicare/Medicaid beneficiaries to enroll at Oak Street.

49.　　The fraudulent scheme was confirmed to Mr. Stinson during a series of phone calls with Oak Street's Vice President of Managed Care Partnerships, during which the Oak Street V.P. solicited such a kickback arrangement with Mr. Stinson's FMO, the Stinson Group.

50.　　The calls were originally scheduled to discuss Stinson Group's marketing efforts for one its Medicare Advantage clients—a company called Zing Health. (Oak Street provides healthcare services to some of Zing Health's Medicare Advantage beneficiaries.) During the calls, however, Oak Street began offering Stinson Group certain kickbacks in exchange for having its team of insurance sales agents refer Medicare beneficiaries directly to Oak Street.

51.　　One of the phone calls (which occurred in August 2020) was recorded on the

15

Stinson Group's corporate phone line.[6]  Below are a few excerpts from the August 2020 call:

> **OAK STREET VP:** [W]e are doing a lot of coop marketing programming just trying to see . . . . I'd love to see 35 folks on the call center side and all that but today I was kind of like, how can I help?  ***Is there something I can do with you all that would help drive certain numbers and whether to me it doesn't have to be all Zing but with these markets we're talking about we could do some surgical specific marketing around those 5 to 7 mile radius of each of our centers.  I'm kind of interested in that and I do have money.***  I just kind of need to understand if you need our help?  That's one thing.  ***I haven't seen anyone turn us down yet but you never know.***  I'm just trying to be a good partner and I think this Zing thing is a tough row to hoe in terms of a slow pattern of success.

> * * *

> **OAK STREET VP:**  I mean what I'm thinking about is if we were to do just really basic stuff here.  ***Nothing that is Oak Street branded but if you guys were interested in doing coop marketing, you know the LIS or extra benefits kind of stuff***.  It could include on that kind of marketing the BRC [Business Reply Card] piece that there is transportation as part of that, of course.  ***What I've seen that has been successful in other markets right now are doing like those 5 mile mailings to each center***.  So if you add up all the centers that are basically eligible for this joint effort between us and Zing you might be looking at each wave around 3,000, 4,000 mailers around each of those.  Maybe it's more, it might be more than that depending . . . . So you might end up with say 20,000 or 30,000 mailers and we try to do a wave . . . . Basically you guys are doing the lifting on it but you do it at the end of October or early November to try and catch the second half and see if we can drum up some more good leads in these neighborhoods.  That's kind of what I've been thinking about.  And like I said, we are having a lot of success with it in other markets.

> But I don't know, what do you guys think of something like that?  Basically, ***I could put a marketing agreement together, if we're talking 20,000 mailers I'm looking at like around $10,000,*** essentially like $0.50, however mailers is cutting it in half and ***I could probably do the funding for it*** and then in terms of what we are seeing with responses, it's like a 2% what I'm looking at for response rate and then ***like 60% enrollment from that and we end***

---

[6] Oak Street consented to the recording because the Stinson Group's corporate phone line provided all parties a pre-recording disclosure that the call was being recorded.

*up getting, in this case, we might be getting all those enrollments like you said—50-60% of those [2% returns] end up becoming Oak Street patients*, so not really a Zing thing but it helps Zing . . . .

\* \* \* \*

**OAK STREET VP:** Here's what I'd say just back to this, if you guys want to put your heads together and send me and Karen—"okay this is what we think Oak Street could support"—would be really helpful from a marketing standpoint to help us support something like that, because we are running out of times in terms of being able to drop any marketing. . . . *I basically need the scope of that: What centers?  How many mailers and sort of dollar wise what you think would help?  That's one thing, not to belabor it.  If you don't want to do that, I am cool with that too.  I just want you to know I'm willing to do that to help*. . . . I'm just trying to think of whatever creative ways I can to help you guys be successful around the zip codes where our centers are located is what I'm really after. . . .

\* \* \* \*

**OAK STREET VP:** If you can get me just the raw numbers of estimates of number of Mailers . . . I could send [an agreement] over to you tomorrow or as soon as I have it.  It won't take me but 10 minutes  . . . . I've got to have legal approve it and look it over, which takes like 10 minutes because they [the marketing agreements] are all the same. . . .

\* \* \* \*

**OAK STREET VP:** If you want to present other ideas that would be separate marketing agreements, I am open man . . . . I've got the CEO of the company emailing me at 10:30 last night and looking at all of this stuff and asking me questions.  So everybody's eyes are on it, and *if you and the Stinson Group and Oak Street and can show a lot of success right now, this is something I would want to keep doing with you month after month, year after year.*  Again, I'm agnostic about the carriers.  Whatever you think it best for the client—*as long as we take the plan, I'm good.*

52.    In short, the Oak Street VP solicited a kickback arrangement with Stinson Group, offering to pay Stinson Group $10,000 cash (to finance 20,000 mailer advertisements) in exchange for Stinson Group referring all responding patients to Oak Street for enrollment.  The payment was

based on the volume and amount of patients referrals, as Oak Street knew that the proposed payment would generate approximately 200–240 of newly enrolled Medicare patients at Oak Street (*i.e.*, $10,000 for 20,000 mailers x 2% response rate x 50–60% = 200–240 new Medicare patients enrolled at Oak Street). In essence, Oak Street set a sales minimum (of 200-240 patients) that Stinson Group must meet in exchange for the $10,000.

53. While the recorded phone call specifically mentioned cash payments for mailers, Oak Street also offered to pay Stinson Group in the form of other free advertisements, including billboards, commercials, and digital marketing efforts, in exchange for Stinson Group and its agents referring patients to Oak Street. Oak Street offered Stinson Group and its agents whatever "help" (*i.e.*, cash or free advertisements) was needed to market to Medicare beneficiaries, in exchange for referring all those beneficiaries to Oak Street for care. Most tellingly, Oak Street wanted advertisements to be covert and not specifically mention Oak Street by name. That is because Oak Street knew the proposed arrangement was illegal and did not want the Medicare beneficiaries to be aware of the kickback referral arrangement.

54. In follow up emails and during a subsequent phone call with Stinson Group and Zing Health, Oak Street also offered ***direct commission payments of $200 per referral*** to Stinson Group's sales agents for each Medicare/Medicaid patient referred to Oak Street. For example, on November 25, 2020, Mr. Stinson received an email from Zing Health's Vice President of Sales and Marketing regarding Oak Street's "Client Awareness Program," stating that "agents can earn an additional $200 for every person they refer to OSH [*i.e.*, Oak Street Health]."[7] During a

---

[7] In addition to the $200 referral payment, Oak Street also identifies the referring agent as the "Agent of Record" in its SalesForce CRM system—so that if the patient ever tries to change insurance, someone at Oak Street will contact that agent and notify them, so that the agent may steer the patient back to Oak Street for continued care.

subsequent call on December 3, 2020, Oak Street talked more about its Client Awareness Program, stating that it will pay the $200 "directly to the sales agents" for every single Medicare/Medicaid beneficiary referred to Oak Street for enrollment. Oak Street also explained that it required that at least 50% of those referrals result in enrollment; otherwise, Oak Street would terminate the sales agents and not pay future referral payments. Oak Street also sent Mr. Stinson a slide deck outlining the Client Awareness Program. Below are a few slides from that deck:

## Client Awareness Program Overview

**Who?** Select Medicare insurance brokers are eligible to receive a financial incentive for educating their clients about value-based care and Oak Street Health, resulting in a warm transfer or successful lead for Oak Street Health.

**What?** Goals:

- For clients who live near an Oak Street Health center, especially those without a PCP or dissatisfied with their PCP, speak about Oak Street Health as an option.
- Whether or not the client selects Oak Street as PCP, help them schedule a Welcome Visit (first appointment) to meet our care team and decide whether we are the right primary care home for them.
- Ask for the client's permission to connect them with Oak Street Health to learn more.

**Where?** To send and document the lead:

- Make a warm transfer to your OSH contact or the dedicated call center number provided, AND
- Fill out OSH's online client referral form

**When?** October 1 - December 31, 2020 (program start date may be later, depending on when OSH received the required signed agreements; programs are effective for 3 months and then re-evaluated)

**Why?**

- Your clients *deserve* to know about Oak Street Health, our quality of care and patient experience. Be a resource to your clients and build loyalty.
- Earn money during AEP by having a conversation, even after the December 7 AEP deadline. Payments are made monthly during the program.

*Confidential: Do Not Distribute* [3]

# Requirements, Referral Process, Reporting

- All participating agents are required to sign the Statement of No Limitation or Conflict to Share Contacts.

- When a client agrees to be connected to OSH, here are your options *(live transfers preferred to ensure the lead stays warm and OSH is able to connect with your client/prospect)*:

    a. **Conduct a 3-way call (live transfer) with your designated local contact (Outreach Director or Executive).** Fill out the online agent referral form and under "Referral type" select "Warm transfer." Fill out your Oak Street Health contact name at the bottom of the form.

        ■ **If your local contact does not answer, call the dedicated number provided for your program.\*** The Oak Street Health call center will answer. Fill out the online agent referral form and under "Referral type" select "Warm transfer." You do not need to select a local contact if you spoke with a call center representative.

        ■ **OSH Call Center Hours:** Monday - Sunday, 7am - 8pm Central Time / 8am - 9pm Eastern Time

    b. If you are not able to make a live transfer, fill out the online agent referral form and under "Referral type" select "Oak Street Health to call client." Fill out your Oak Street Health contact name at the bottom of the form.

- Each week during the program, the participating agent and/or FMO meets with Oak Street Health to review results. Only leads entered in the online agent referral form qualify for payment.

*\*Note: Agents participating in an FMO/agency program will have a unique campaign phone number for that FMO/agency. Agents participating via an individual agreement will have a different campaign phone number.*

*Confidential: Do Not Distribute* *

# Call Center Introductions - Tips for Agents

- **When calling the dedicated number for your Client Awareness Program, you will reach the Oak Street Health call center.**

    Make sure to prepare your client by letting them know you will share key information with OSH to get the ball rolling, such as their Medicare ID # and birth date. Inform your client that you will stay on the line (or remain physically present with them) during the call.

- **Introduce yourself and your client to the call center representative, with some brief background information:**

    **Example 1:** Hi, Jamileet [call center representative name], this is Rick Thompson [agent name] with Acme Insurance Agency [agency name]. I have one of my new clients on the line with me (or here with me) who is interested in [learning more about Oak Street Health] or [scheduling a first appointment (Welcome Visit) with Oak Street Health]. Her Medicare ID # is XXXXXXXX and her birth date is 12/00/0000.

    **Example 2:** Hi, Jamileet [call center representative name], this is Rick Thompson [agent name ] with Acme Insurance Agency [agency name] calling to help my client, Mrs. Martha Johnson [client name], schedule a first appointment. She has just enrolled in a Humana HMO plan [carrier/plan name] and she has selected the Oak Street Health Speedway location [insert OSH center name here] as her PCP. Her Medicare ID # is XXXXXXXX and her birth date is 12/00/0000.

    **Example 3:** Hi, Jamileet [call center representative name], this is Rick Thompson [agent name ] with Acme Insurance Agency [agency name] calling to introduce my client, Mrs. Smith [client name], to Oak Street Health. Could you please share more information about your unique care model and answer any questions she may have? Mrs. Smith [client name] may choose to schedule an appointment with Oak Street today, or at a later date, based on the information you provide.

*Confidential: Do Not Distribute* *

55.     These direct commission payments to sales agents pursuant to the "Client Awareness Program" are illegal kickbacks in exchange for patient referrals and violate the Anti-Kickback Statute.

56.     Lastly, in addition to cash payments, free marketing/advertising, and direct commission payments, Oak Street is also offering the John Doe Entities indirect commission payments.  In particular, in exchange for referring Medicare/Medicaid beneficiaries to Oak Street for enrollment, Oak Street is permitting the John Doe Entities and individual sales agents to participate in "AEP Clinic Staffing Opportunities" and "Telephonic Opportunities," whereby Oak Street gives the sales agents the names and contact information of Oak Street patients who are either privately insured or who are on traditional Medicare, so that the agents may contact the patients and illegally steer them to change their healthcare plans to a Medicare Advantage plan ("MA Plan")—if successful, the sales agent would earn a commission for enrolling the patient on a MA Plan.  Although these commissions are paid by the MA Plan rather than Oak Street, Oak Street is improperly sharing private and proprietary patient information with referring sales agents to further incentivize them to steer patients to Oak Street, and in exchange for those referrals. Moreover, these commissions are paid not only for the initial enrollment or switch, but also for each subsequent renewal.  In 2020, for example, the agent commission rates were $255 per switch/renewal and $510 per original/new enrollee to a MA Plan—thereby permitting agents to receive commissions indirectly from Oak Street equaling several hundred dollars per year per patient, and several thousand dollars throughout the expected renewal term for a single patient.

57.     Stinson Group is not the first or only FMO or marketing/sales entity that Oak Street has solicited or attempted to solicit for its illegal kickback scheme.  During the August 2020 call, the Oak Street VP stated that Oak Street has had "success in other markets," that Oak Street "ha[s]n't seen anyone turn [it] down yet" and that finalizing the agreements takes only 10 minutes because they "are all the same."  In addition, during the December 3, 2020 phone call, Oak Street stated it already has "a lot of agents and agencies doing this" to facilitate Oak Street's rapid growth.

21

58.     Therefore, while Stinson Group refused to participate in Oak Street's illegal kickback scheme, Oak Street has, upon information and belief, already entered into multiple illegal kickback arrangements with numerous John Doe Entities to illegally solicit, refer, and steer Medicare beneficiaries to Oak Street.

59.     In addition, Oak Street is currently in the process of opening additional clinics in other states.  In fact, during its communications with Stinson Group, Oak Street stated that for its new clinics, it wanted Stinson Group to have a list of "250 or so patients ready for enrollment for when the doors open" at Oak Street's new clinics.

60.     Oak Street's kickback arrangements constitute a violation of the AKS.  Oak Street's unlawful kickbacks tainted all services and care provided to the patients that were improperly referred to Oak Street.  By billing and/or receiving money from the Government for providing care to those patients, Oak Street has violated the False Claims Act.

**B.     Improperly Advertising, Offering, and Providing Free Transportation to Medicare Beneficiaries to Illegally Induce Them to Enroll at Oak Street**

61.     Since at least August 2020 (and upon information and belief, since as early as 2012), Oak Street has been improperly advertising, offering, and providing free transportation to Medicare beneficiaries to illegally induce them to enroll at Oak Street.

62.     In particular, Oak Street has a fleet of 100+ bright green vans that are customized and fully loaded and designed for transporting elderly individuals to Oak Street's clinic for doctor appointments, visits and community events at the clinics.  Oak Street has hired teams of drivers—referred to as "transportation valets"—whose sole duty is to drive patients to and from Oak Street's clinic for care.  Below is a picture of one of Oak Street's vans:



63.     Oak Street confirmed its free transportation marketing and advertisement conduct during multiple phone calls with Mr. Stinson. In fact, as part of the kickback arrangement discussed during the August 2020 phone call (*see supra* Section VI.A), Oak Street specifically proposed that Stinson Group market the free transportation to prospective Medicare/Medicaid beneficiaries, stating:

> **OAK STREET VP:** Nothing that is Oak Street branded but if you guys were interested in doing coop marketing, you know the LIS or extra benefits kind of stuff. ***It could include on that that kind of marketing the DRC piece that there is transportation as part of that, of course.***

64.     Oak Street publicly markets and advertises its free transportation to prospective patients (who are all Medicare/Medicaid beneficiaries) for the sole purpose of inducing them to choose to receive care at an Oak Street facility (rather than elsewhere).

65.     By offering and providing free transportation, Oak Street violated and continues to violate the AKS and AIS, because the services influenced and induced (and continue to influence and induce) Medicare/Medicaid beneficiaries into choosing to receive care at Oak Street rather

than elsewhere. That the free transportation was publicly marketed and advertised renders the service outside the safe harbor exception. As a result, Oak Street's unlawful inducements tainted all services and care provided to those patients. By billing and/or receiving money from the Government for providing care to those patients, Oak Street has violated the False Claims Act.

\*       \*       \*

66.     In sum, Oak Street has defrauded the Government by billing and/or receiving money for healthcare services that were tainted as a result of the above-described kickback and inducement schemes. Oak Street's fraudulent conduct was material to the Government's payment decision; in other words, had the Government known about the unlawful kickbacks and inducements, it would not have paid Oak Street for providing healthcare services to those Medicare/Medicaid beneficiaries.

67.     The damages incurred by the Government as a result of Oak Street's fraudulent scheme are substantial. Because Oak Street improperly procured and enrolled Medicare/Medicaid beneficiaries as patients using the illegal kickback and inducement schemes described herein, all services and care provided to those patients are tainted and not lawfully payable by the Government. Therefore, a significant portion of Oak Street's Medicare/Medicaid revenue from 2012 to the present is tainted as a result of the illegal kickback and inducements schemes. For reference, Oak Street's Q3 2020 revenue from Medicare/Medicaid was $218 million (a 57% increase from its Q3 2019 revenue), and the company projects full-year 2020 Medicare/Medicaid revenue between $854 million to $858 million. Much of this revenue, from 2012 to the present, is at issue in this FCA case. Upon information and belief, the fraud continues still today—and will continue to grow in scope as Oak Street is currently in the process of opening additional clinics in other states.

## COUNT ONE
## VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(A)

68.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

69.      As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly presented false or fraudulent claims for payment, or knowingly caused false or fraudulent claims for payment to be presented, to officials of the United States Government in violation of 31 U.S.C. § 3729(a)(1)(A).  Oak Street knowingly and falsely certified that its claims for reimbursement complied with all applicable laws and regulations.

70.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Oak Street, the United States suffered actual damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT TWO
## VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(B)

71.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

72.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly and falsely certified that its claims for reimbursement complied with all applicable laws and regulations.

73.     By virtue of the false or fraudulent certifications submitted or caused to be submitted by Defendants, the United States suffered actual damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT THREE
### VIOLATION OF THE FALSE CLAIM ACT
### 31 U.S.C. 3729(a)(1)(C)

74.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

75.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly conspired to commit a violation of the False Claims Act in violation of 31 U.S.C. §3729(a)(1)(C).

76.     By virtue of said conspiracy, the United States suffered actual damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT FOUR
### VIOLATION OF THE FALSE CLAIM ACT
### 31 U.S.C. 3729(a)(1)(G)

77.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

78.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

79.     The Affordable Care Act requires a person who has received an overpayment of Medicare or Medicaid to report and return the overpayment within 60 days of identification or the date of any corresponding cost report is due, and failure to report and return the overpayment is an obligation for purposes of the False Claims Act under 31 U.S.C. § 3729(a)(1)(G).  *See* 42 U.S.C.

§ 1320a-7k(d).

80.     By virtue of Oak Street's violations of 31 U.S.C. § 3729(a)(1)(G), the United States suffered actual damages and is therefore entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT FIVE**
**VIOLATION OF THE ILLINOIS WHISTLEBLOWER REWARD**
**AND PROTECTION ACT**
**740 ILL. COMP. STAT. § 175/3(a)(1)(A)**

81.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

82.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly presented or caused to be presented to the State of Illinois false or fraudulent claims for payment or approval in violation of 740 Ill. Comp. Stat. §175/3(a)(1)(A).

83.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the State of Illinois suffered actual damages and therefore is entitled to treble damages under the Illinois Whistleblower and Protection Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT SIX**
**VIOLATION OF THE ILLINOIS WHISTLEBLOWER REWARD**
**AND PROTECTION ACT**
**740 ILL. COMP. STAT. § 175/3(a)(1)(B)**

84.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

85.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly made, used, or caused to be made or used false records or

27

statements material to false or fraudulent claims submitted to the State of Illinois in violation of 740 Ill. Comp. Stat. §175/3(a)(1)(B).

86.     By virtue of the false or fraudulent records or statements submitted or caused to be submitted by Defendants, the State of Illinois suffered actual damages and therefore is entitled to treble damages under the Illinois Whistleblower and Protection Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT SEVEN**
**VIOLATION OF THE ILLINOIS WHISTLEBLOWER REWARD**
**AND PROTECTION ACT**
**740 ILL. COMP. STAT. § 175/3(a)(1)(C)**

87.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

88.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly conspired with others to commit violations of the Illinois Whistleblower and Protection Act in violation of 740 Ill. Comp. Stat. §175/3(a)(1)(C).

89.     By virtue of said conspiracy, the State of Illinois suffered actual damages and therefore is entitled to treble damages under the Illinois Whistleblower and Protection Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT EIGHT**
**VIOLATION OF THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER**
**PROTECTION ACT**
**IND. CODE § 5-11-5.5-2(b)(1) & (8)**

90.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

91.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly presented or caused to be presented to the State of Indiana

false or fraudulent claims for payment or approval in violation of Ind. Code. §5-11-5.5-2(b)(1) & (8).

92.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the State of Indiana suffered actual damages and therefore is entitled to treble damages under the Indiana False Claims and Whistleblower Protection Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT NINE**
**VIOLATION OF THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER**
**PROTECTION ACT**
**IND. CODE § 5-11-5.5-2(b)(2) & (8)**

93.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

94.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims submitted to the State of Indiana in violation of Ind. Code §5-11-5.5-2(b)(2) & (8).

95.     By virtue of the false or fraudulent records or statements submitted or caused to be submitted by Defendants, the State of Indiana suffered actual damages and therefore is entitled to treble damages under the Indiana False Claims and Whistleblower Protection Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT TEN**
**VIOLATION OF THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER**
**PROTECTION ACT**
**IND. CODE § 5-11-5.5-2(b)(7)**

96.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

97.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly conspired with others to commit violations of the Indiana False Claims and Whistleblower Protection Act in violation of Ind. Code §5-11-5.5-2(b)(7).

98.     By virtue of said conspiracy, the State of Indiana suffered actual damages and therefore is entitled to treble damages under the Indiana False Claims and Whistleblower Protection Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT ELEVEN**
**VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT**
**MICH. COMP. LAWS § 400.607(1)**

99.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

100.    As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly presented or caused to be presented to the State of Michigan false or fraudulent claims for payment or approval in violation of Mich. Comp. Laws § 400.607(1).

101.    By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the State of Michigan suffered actual damages and therefore is entitled to treble damages under the Michigan Medicaid False Claims Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT TWELVE**
**VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT**
**MICH. COMP. LAWS § 400.607(2)**

102.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

103.    As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly made, used, or caused to be made or used false records or

statements material to false or fraudulent claims submitted to the State of Michigan in violation of Mich. Comp. Laws § 400.607(2).

104.    By virtue of the false or fraudulent records or statements submitted or caused to be submitted by Defendants, the State of Michigan suffered actual damages and therefore is entitled to treble damages under the Michigan Medicaid False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT THIRTEEN
## VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT
### MICH. COMP. LAWS § 400.606(1)

105.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

106.    As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly conspired with others to commit violations of the Michigan Medicaid False Claims Act in violation of Mich. Comp. Laws § 400.606(1).

107.    By virtue of said conspiracy, the State of Michigan suffered actual damages and therefore is entitled to treble damages under the Michigan Medicaid False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT FOURTEEN
## VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT
### MICH. COMP. LAWS § 400.604

108.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

109.    As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly solicited, offered, and/or received kickbacks or bribes in connection with the furnishing of goods for which payment may be made by the State of Michigan

in violation of Mich. Comp. Laws § 400.604.

110.     By virtue of said kickbacks and bribes, the State of Michigan suffered actual damages and therefore is entitled to treble damages under the Michigan Medicaid False Claims Act, to be determined at trial, plus a civil penalty for each violation.

### COUNT FIFTEEN
### VIOLATION OF THE NEW YORK FALSE CLAIMS ACT
### N.Y. STATE FIN. LAW § 189(1)(a)

111.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

112.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly presented or caused to be presented to the State of New York false or fraudulent claims for payment or approval in violation of N.Y. State Fin. Law § 189(1)(a).

113.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the State of New York suffered actual damages and therefore is entitled to treble damages under the New York False Claims Act, to be determined at trial, plus a civil penalty for each violation.

### COUNT SIXTEEN
### VIOLATION OF THE NEW YORK FALSE CLAIMS ACT
### N.Y. STATE FIN. LAW § 189(1)(b)

114.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

115.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims submitted to the State of New York in violation of N.Y. State Fin. Law § 189(1)(b).

116. By virtue of the false records or statements submitted or caused to be submitted by Defendants, the State of New York suffered actual damages and therefore is entitled to treble damages under the New York False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT SEVENTEEN
## VIOLATION OF THE NEW YORK FALSE CLAIMS ACT
### N.Y. STATE FIN. LAW § 189(1)(c)

117. Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

118. As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly conspired with others to commit violations of the New York False Claims Act in violation of N.Y. State Fin. Law § 189(1)(c).

119. By virtue of said conspiracy, the State of New York suffered actual damages and therefore is entitled to treble damages under the New York False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT EIGHTEEN
## VIOLATION OF THE NORTH CAROLINA FALSE CLAIMS ACT
### N.C. GEN. STAT. § 1-607(a)(1)

120. Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

121. As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly presented or caused to be presented to the State of North Carolina false or fraudulent claims for payment or approval in violation of N.C. Gen. Stat. § 1-607(a)(1).

122. By virtue of the false or fraudulent claims submitted or caused to be submitted by

Defendants, the State of North Carolina suffered actual damages and therefore is entitled to treble damages under the North Carolina False Claims Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT NINETEEN**
**VIOLATION OF THE NORTH CAROLINA FALSE CLAIMS ACT**
**N.C. GEN. STAT. § 1-607(a)(2)**

123.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

124.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim submitted to the State of North Carolina in violation of N.C. Gen. Stat. § 1-607(a)(1).

125.     By virtue of the false records or statements submitted or caused to be submitted by Defendants, the State of North Carolina suffered actual damages and therefore is entitled to treble damages under the North Carolina False Claims Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT TWENTY**
**VIOLATION OF THE NORTH CAROLINA FALSE CLAIMS ACT**
**N.C. GEN. STAT. § 1-607(a)(3)**

126.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

127.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly conspired with others to commit violations of the North Carolina False Claims Act in violation of N.C. Gen. Stat. § 1-607(a)(1).

128.     By virtue of said conspiracy, the State of North Carolina suffered actual damages

34

and therefore is entitled to treble damages under the North Carolina False Claims Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT TWENTY-ONE**
**VIOLATION OF THE RHODE ISLAND FALSE CLAIMS ACT**
**R.I. GEN. LAWS § 9-1.1-3(a)(1)**

129.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

130.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly presented or caused to be presented to the State of Rhode Island false or fraudulent claims for payment or approval in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

131.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the State of Rhode Island suffered actual damages and therefore is entitled to treble damages under the Rhode Island False Claims Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT TWENTY-TWO**
**VIOLATION OF THE RHODE ISLAND FALSE CLAIMS ACT**
**R.I. GEN. LAWS § 9-1.1-3(a)(2)**

132.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

133.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims submitted to the State of Rhode Island in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

134.     By virtue of the false records or statements submitted or caused to be submitted by

35

Defendants, the State of Rhode Island suffered actual damages and therefore is entitled to treble damages under the Rhode Island False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT TWENTY-THREE
## VIOLATION OF THE RHODE ISLAND FALSE CLAIMS ACT
### R.I. GEN. LAWS § 9-1.1-3(a)(3)

135.  Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

136.  As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly conspired with others to commit violations of the Rhode Island False Claims Act in violation of R.I. Gen. Laws § 9-1.1-3(a)(3).

137.  By virtue of said conspiracy, the State of Rhode Island suffered actual damages and therefore is entitled to treble damages under the Rhode Island False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT TWENTY-FOUR
## VIOLATION OF THE TENNESSEE FALSE CLAIMS ACT
### TENN. CODE ANN. § 4-18-103(a)(1)

138.  Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

139.  As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly presented or caused to be presented to the State of Tennessee false or fraudulent claims for payment or approval in violation of Tenn. Code Ann. § 4-18-103(a)(1).

140.  By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the State of Tennessee suffered actual damages and therefore is entitled to treble

damages under the Tennessee False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT TWENTY-FIVE
### VIOLATION OF THE TENNESSEE FALSE CLAIMS ACT
#### TENN. CODE ANN. § 4-18-103(a)(2)

141.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

142.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims submitted to the State of Tennessee in violation of Tenn. Code Ann. § 4-18-103(a)(2).

143.     By virtue of the false records or statements submitted or caused to be submitted by Defendants, the State of Tennessee suffered actual damages and therefore is entitled to treble damages under the Tennessee False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT TWENTY-SIX
### VIOLATION OF THE TENNESSEE FALSE CLAIMS ACT
#### TENN. CODE ANN. § 4-18-103(a)(3)

144.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

145.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly conspired with others to commit violations of the Tennessee False Claims Act in violation of Tenn. Code Ann. § 4-18-103(a)(3).

146.     By virtue of said conspiracy, the State of Tennessee suffered actual damages and therefore is entitled to treble damages under the Tennessee False Claims Act, to be determined at

trial, plus a civil penalty for each violation.

## COUNT TWENTY-SEVEN
## VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### TENN. CODE ANN. § 71-5-182(a)(1)(A)

147.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

148.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly presented or caused to be presented to the State of Tennessee false or fraudulent claims for payment or approval in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

149.     By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the State of Tennessee suffered actual damages and therefore is entitled to treble damages under the Tennessee Medicaid False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT TWENTY-EIGHT
## VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### TENN. CODE ANN. § 71-5-182(a)(1)(B)

150.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

151.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims submitted to the State of Tennessee in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

152.     By virtue of the false records or statements submitted or caused to be submitted by Defendants, the State of Tennessee suffered actual damages and therefore is entitled to treble

damages under the Tennessee Medicaid False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT TWENTY-NINE
## VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### TENN. CODE ANN. § 71-5-182(a)(1)(C)

153.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

154.    As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly conspired with others to commit violations of the Tennessee Medicaid False Claims Act in violation of Tenn. Code Ann. § 71-5-182(a)(1)(C).

155.    By virtue of said conspiracy, the State of Tennessee suffered actual damages and therefore is entitled to treble damages under the Tennessee Medicaid False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT THIRTY
## VIOLATION OF THE TEXAS MEDICAID FRAUD PREVENTION LAW
### TEX. HUM. RES. CODE § 36.002(1)

156.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

157.    As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly presented or caused to be presented to the State of Texas false or fraudulent claims for payment or approval in violation of Tex. Hum. Res. Code § 36.002(1).

158.    By virtue of the false or fraudulent claims submitted or caused to be submitted by Defendants, the State of Texas suffered actual damages and therefore is entitled to treble damages under the Texas Medicaid Fraud Prevention Law, to be determined at trial, plus a civil penalty for

each violation.

## COUNT THIRTY-ONE
## VIOLATION OF THE TEXAS MEDICAID FRAUD PREVENTION LAW
### TEX. HUM. RES. CODE § 36.002(4)(A)

159.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

160.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims submitted to the State of Texas in violation of Tex. Hum. Res. Code § 36.002(4)(A).

161.     By virtue of the false records or statements submitted or caused to be submitted by Defendants, the State of Texas suffered actual damages and therefore is entitled to treble damages under the Texas Medicaid Fraud Prevention Law, to be determined at trial, plus a civil penalty for each violation.

## COUNT THIRTY-TWO
## VIOLATION OF THE TEXAS MEDICAID FRAUD PREVENTION LAW
### TEX. HUM. RES. CODE § 36.002(9)

162.     Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

163.     As set forth above, since at least August 2020 (and upon information and belief, as early as 2012), Oak Street knowingly conspired with others to commit violations of the Texas Medicaid Fraud Prevention Law in violation of Tex. Hum. Res. Code § 36.002(9).

164.     By virtue of said conspiracy, the State of Texas suffered actual damages and therefore is entitled to treble damages under the Texas Medicaid Fraud Prevention Law, to be determined at trial, plus a civil penalty for each violation.

## PRAYER FOR RELIEF

WHEREFORE, the Government and Relator demand that judgment be entered against Defendants and in favor of the Relator and the Government as follows:

On Count One through Count Thirty-Two under the federal False Claims Act (and amended and equivalent state statutes), for the amount of the United States' and States' damages, multiplied by three as required by law, and such civil penalties as are permitted or required by law; the maximum share amount allowed pursuant to 31 U.S.C. § 3730(d) and applicable state laws; all costs and expenses of this action, including attorney fees, expenses and costs as permitted by 31 U.S.C. § 3730(d) and applicable state laws; and all such other relief as may be just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: December 11, 2020        Respectfully submitted,

*/s/ Adam J. Levitt*
Adam J. Levitt
Adam Prom
**DiCELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900
alevitt@dicellolevitt.com
aprom@dicellolevitt.com

Greg G. Gutzler*
F. Franklin Amanat*
**DiCELLO LEVITT GUTZLER LLC**
444 Madison Avenue, Fourth Floor
New York, New York 10022
Telephone: (646) 933-1000
ggutzler@dicellolevitt.com
famanat@dicellolevitt.com

Gregory M. Utter*
Joseph M. Callow, Jr.*
Collin L. Ryan*
**KEATING MUETHING & KLEKAMP PLL**
One East Fourth Street, Suite 1400
Cincinnati, Ohio 45202
Phone: (513) 579-6400
Fax: (513) 579-6457
gmutter@kmklaw.com
jcallow@kmklaw.com
cryan@kmklaw.com

Joel D. Hesch*
**THE HESCH FIRM, LLC**
3540 Ridgecroft Dr.
Lynchburg, Virginia  24503
Phone: (434) 229-8677
joel@howtoreportfraud.com

*Attorneys for Relator, Joseph Stinson*
*\* Pro hac vice applications forthcoming*